UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                          CASE NO. 8:17-cr-511-T-24AEP

RASHICA SHAGUANA FORD,

    Defendant.
_____/

## DEFENDANT RASHICA FORD'S SENTENCING MEMORANDUM

Comes now the Defendant, RASHICA SGAGUANA FORD, by and through undersigned

counsel, and hereby files this Sentencing Memorandum in advance of the sentencing proceeding

scheduled for September 20, 2018.  Ms. Ford was convicted at trial of Count One of the Indictment

charging her with conspiracy to commit arson in violation of 18 U.S.C. § 844(n).  Ms. Ford prays

the Court show leniency for the reasons set forth below.

As the Court presided over the trial in this matter, the Court is well aware of the facts and

circumstances of this case, and they will not be discussed in detail here.[1]  Assuming for purposes

of sentencing that Ms. Ford did commit this offense, then the important inquiry is what personal

weakness caused it and how can it be addressed through the sentencing process. "It has been

uniform and constant in the federal judicial tradition for the sentencing judge to consider every

convicted person as an individual and every case as a unique study in the human failings that

sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v.*

---

[1] Although this memorandum will make reference to certain evidence presented at trial, Ms. Ford wishes to preserve her right to appeal, and nothing contained herein should be construed as an admission to any of the facts underlying her conviction.  Ms. Ford understands that the evidence presented and ultimately accepted by the jury is what the Court will draw from to determine her sentence.  However, Ms. Ford's acceptance of certain facts for sentencing purposes should not be construed as a waiver of any challenges to the evidence or other appellate issues.

1

*United States*, 131 S.Ct. 1229, 1240 (2011) (citing *Koon v. United States,* 518 U.S. 81, 113, 116 (1996)).

Ms. Ford's mother was sixteen when she gave birth to Ms. Ford which undoubtedly created some instability in her youth. Her father was never part of her life, and she was raised by her teenage mother with the help of her mother's aunt and uncle.

One of Ms. Ford's earliest memories is of being sexually abused by the teenage son of her mother's friend when she was a child. Her medical history also indicates a history of anxiety and exogenous depression.[2] She received some very limited counseling as a teenager, but Ms. Ford does not know why it was discontinued. She presumes the cost of such counseling was prohibitive for her family. Due in part to these issues, Ms. Ford never succeeded in school. She was near the bottom of her class when she dropped out after completing her sophomore year of high school.

Ms. Ford struggled to overcome her circumstances, and eventually became a young mother. In looking back at her life, Ms. Ford's relationships with men have been consistently detrimental. From the time of the birth of her first child twenty years ago, every boyfriend has physically abused her. All of her children have different fathers and none have provided any support to her, financial or otherwise.

In addition to physical and verbal abuse, the men in her life have also involved her in their own trouble as reflected in her criminal history. Ms. Ford's 2011 conviction for petit left occurred with a male companion. Likewise, her 2011 charge for sale or delivery of a controlled substance, for which adjudication was withheld, came because she was in the car with her boyfriend when he conducted a sale of a controlled substance. Similarly, her fraud convictions from 2012 resulted

---

[2] Exogenous depression is defined as "outside the person" meaning that it is typically caused by the circumstances or surroundings of a person's life such as a traumatic event. This is contrasted with endogenous depression which is believed to be caused from "within the person" such as through heredity or genetic makeup.

from her arrest while a passenger in her boyfriend's car when police found false tax return filings and related records in a safe in the trunk of her boyfriend's car.

Unfortunately, the offense at issue followed the pattern as Ms. Ford's then boyfriend, Jodarian Whitfield, played a prominent role. Although he denied it, there was testimony at trial that Mr. Whitfield physically abused Ms. Ford and regularly used controlled substances. His history evinces a life of crime that includes violent offenses. He even thought at one time that he was schizophrenic.

Ms. Ford also has a significant number of dismissed or nolle prossed cases. Ms. Ford grew up and has always lived in tough, impoverished neighborhoods where unfortunately violence is common. Frequently police are called to a situation and the person actually responsible for the event gives a false version of the situation which makes it into the police report. Once the situation is actually assessed the case is dismissed or not pursued. For example, a report from September 18, 2014, indicates Ms. Ford tasered a man. However, the initial report failed to include that the man was physically beating Ms. Ford, and she used the taser in self-defense. Once that fact became known, the case was dismissed.

It is also noteworthy that all of Ms. Ford's criminal history points come from cases that occurred from 2011 and later. Outside of some arrests when Ms. Ford was much younger, her criminal history through 2011 is minimal and all cases were dropped. Perhaps not coincidentally, Ms. Ford reports that in 2011 she was injured in an automobile accident for which she was prescribed Oxycodone. She became addicted and used Oxycodone regularly in addition to smoking marijuana. In what was a common occurrence over the past decade, an auto injury medical clinic continued to prescribe Oxycodone to her for years which only enabled her addiction.

When she became pregnant with her youngest child in 2016, she sought help for her addiction and was prescribed methadone by a local clinic.

Childhood trauma has long been known to raise a person's odds of developing depression and addiction. Maia Szalavitz, *How Childhood Trauma May Make the Brain Vulnerable to Addiction, Depression,* TIME HEALTHLAND, Aug. 1, 2012. A study by the researchers at the University of Texas found that maltreated children had either a diagnosable drug problem or depression or both, three times the rate seen in controls. *Id.* This adds to the already voluminous literature which suggests that addiction problems have more to do with people's attempts to manage or flee pain than to satisfy their desire to seek pleasure. *Id.* For example, research has found that "[b]rain conditions may alter addiction vulnerability independently of drug history." R. Andrew Chambers, MD, et. al., *Neonatal Amygdala Lesions: Co-Occurring Impact on Social/Fear-Related Behavior and Cocaine Sensitization in Adult Rats*, LABORATORY FOR TRANSLATIONAL NEUROSCIENCE OF DUAL DIAGNOSIS AND DEVELOPMENT, INST. OF PSYCHIATRIC RES., DEPT. OF PSYCHIATRY, IND. U. SCH. OF MED.; BEHAVIORAL NEUROSCIENCE, Vol 121, No. 6. "Early emotional trauma, paired with a certain genetic background, may alter the early development of neural networks intrinsic to the amygdala, resulting in a cascade of brain effects and functional changes that present in adulthood as a dual-diagnosis disorder [of drug addiction and a mental ailment such as depression]." *Id.*

In *Pepper v. United States,* 131 S.Ct. 1229, 1236 (2011), the Supreme Court commented that "rehabilitation may plainly be relevant to 'the history and characteristics of the defendant.'" *Id.* at 1242. While Ms. Ford bears her own share of responsibility for the path she has taken, it is evident that those in her life have not been a positive influence. However, she is not beyond rehabilitation. Drug treatment and counseling to help her overcome depression and whatever

continues to draw her to destructive relationships would make a significant difference in her life. *See* Doug McVay, Vincent Schiraldi, & Jason Ziedenberg, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Drug Treatment Versus Imprisonment (*March 2004), Justice Policy Institute Policy Report ("Dollar for dollar, treatment reduces the societal costs of substance abuse more effectively than incarceration does.").

Ms. Ford faces a five year mandatory minimum sentence. A sentence of much more than that is neither necessary to protect the public from her because of the treatment she will receive in prison nor will it act as a significant deterrent to others. Certainty of punishment is a much better deterrent than severity. *See* Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011) (deterrence is achieved with certainty of punishment, not its severity); *see also* Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 817 (2010)([I]in virtually every deterrence study to date, the perceived certainty of punishment was more important than the perceived severity). According to experts, prisons are useful in keeping criminals off the street, but prison sentences are unlikely to deter future crime. Nagin, *supra*. Prisons actually may have the opposite effect because inmates learn more effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future imprisonment. *Id*.

Researchers also find an increased likelihood that lower-risk offenders will be more negatively affected by incarceration. Paul Gendreau, Claire Goggin, and Francis T. Cullen, *The Effects of Prison Sentences on Recidivism*, OTTAWA, ONTARIO, CANADA: PUBLIC WORKS AND GOVERNMENT SERVICES CANADA, 1999, at 18. Among low-risk offenders, those who spent less time in prison were four percent less likely to recidivate than low-risk offenders who served longer sentences. *Id*. Thus, when prison sentences are relatively short, offenders are more likely to

maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Lin Song and Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served*, OLYMPIA, WA: WASHINGTON STATE INSTITUTE OF PUBLIC POLICY (1993). Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.  Thomas Orsagh and Jong-Rong Chen, "The Effect of Time Served on Recidivism: An Interdisciplinary Theory," *Journal of Quantitative Criminology,* 4(2):155-171, 1988.

There is not a significant benefit to deterrence by increasing the severity of sentences by imposing longer prison terms. VALERIE WRIGHT, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, THE SENTENCING PROJECT, November 2010, at 9.  Rather, research shows that increasingly lengthy prison terms are counterproductive. *Id*.  A sentence of five years is sufficient in this case to punish Ms. Ford, provide her with treatment and educational opportunities, and allow her to reconnect with her children which have been the only stabilizing influence in her life.

### A.  SENTENCING GUIDELINES OBJECTIONS

Ms. Ford made four objections to her PSR guidelines recommendation.   Two can be resolved in short order.  Ms. Ford objected to the enhancement for obstruction of justice based on her trial testimony and conviction.  Pursuant to *United States v. Dunnigan*, 507 U.S. 87, 96-97 (1993), the fact of her conviction alone is not sufficient to trigger the enhancement absent the Court making a finding that she committed perjury.  If the Court makes that finding on the record, then the objection is resolved.  The other objection is related to the application of one criminal history point for a prior withhold of adjudication (PSR paragraph 29).  Although the Eleventh Circuit has

resolved that issue in favor of counting a withhold of adjudication pursuant to USSG 4A1.2(f), this issue continues to be litigated at the appellate level. Therefore, Ms. Ford wishes to preserve her objection in the event of a change in the law.

Ms. Ford also objects to the application of a base offense level of 24 based on the allegation that Mr. Whitfield threw an incendiary device at the home. Mr. Whitfield testified that he did not throw an incendiary device and never intended to do so. Therefore, there was not a risk that such a device would enter the home. Mr. Whitfield set fire to the ground which did not threaten the interior of the home and was extinguished with a fire extinguisher. Neither Angie Phillips nor any other occupant of the home testified at the trial or offered a different version of events. Based on Mr. Whitfield's testimony and that of law enforcement witnesses, it was not "practically certain" that Mr. Whitfield's conduct would cause death or serious bodily injury or the destruction of the dwelling. *See United States v. Honeycutt*, 8 F.3d 785, 787 (11th Cir. 1993). Therefore, Ms. Ford suggests a base offense level of 20 pursuant to USSG § 2K1.4(a)(2) for endangering a dwelling.

Ms. Ford's last objection is to an enhancement for her role in the offense because the testimony of Mr. Pinckney and Mr. Whitfield indicates that they shared responsibility for the commission of the offense. Although those witnesses testified that Ms. Ford initiated the idea for the offense and brought Mr. Pinckney and Mr. Whitfield into the scheme, they also testified that Ms. Ford exercised very little control over the actual commission of the offense. Both witnesses' testimony about how Ms. Ford caused them to participate was vague and lacked detail. There was no payment or other consideration and neither alleged accomplice seemed to put up much resistance to setting the fire despite having time and the opportunity to avoid it. Other than testimony that they agreed to set the fire, there was not a significant amount of planning. Mr. Whitfield and Mr. Pinckney testified they drove around collecting things they would use to start

7

the fire without Ms. Ford's involvement, and there was no testimony about a specific plan for how the fire would be set.   After Mr. Whitfield and Mr. Pinckney left the party, Mr. Whitfield and Mr. Pinckney acted with complete autonomy and discretion in how, when, and where to set the fire. They were together for two to three hours without any contact with Ms. Ford.  Vague testimony about how Ms. Ford solicited Mr. Whitfield's and Mr. Pinckney's participation in the offense coupled with Mr. Whitfield's and Mr. Pinckney's complete control over gathering supplies and executing the fire supports the conclusion that they were equally responsible for the offense.  *See United States v. Katora*, 981 F.2d 1398, 1402–03 (3d Cir. 1992)(enhancement does not apply when multiple defendants bear equal responsibility for "organizing" their own commission of a crime).[3] Ms. Ford asks that her guideline offense level be revised should the Court sustain these objections.

### B.  REQUEST FOR VARIANCE

Subject to review for reasonableness, district judges are now free to apply their own perceptions of just punishment, deterrence, and protection of the public even when these differ from the perceptions of the Commission members who drew up the guidelines. *United States v. Rodriguez*, 406 F.3d 1261, 1289 (11th Cir. 2005) (Tjoflat, J., dissenting) (citing *Booker*, 125 S.Ct. at 790 (Scalia, J., dissenting)).  Following *Gall, supra*, there is no requirement of "'extraordinary' circumstances to justify a sentence outside the Guidelines range."  *Gall*, 552 U.S. at 47.  "[A] district judge can fairly consider policy statements concerning departures and fairly decide to impose a non-Guidelines sentence without definitively resolving close questions regarding the precise meaning or application of a departure policy statement."  *United States v. Canova*, 412 F.3d 331, 358 n. 28 (2d Cir. 2005).

---

[3] By citing to the testimony of Mr. Whitfield and Mr. Pinckney, Ms. Ford does not admit to the truth of that testimony. Ms. Ford only cites to it for the limited purpose of determining her sentence, and nothing herein should be construed as an admission to any facts presented by witnesses or to her guilt.

While jail and prison do indeed prevent crime while people are locked up, once released, incarceration has, at best, a negligible impact on crime prevention and, at worst, is crime-producing. COMMUNITY CORRECTIONS COLLABORATIVE NETWORK, MYTHS & FACTS: WHY INCARCERATION IS NOT THE BEST WAY TO KEEP COMMUNITIES SAFE 10 (2016). Lengthy imprisonment without some offender specific reason not only burdens government budgets, but also fails to enhance public safety. *See* Wright, *supra* at 9. Yet, the longer Ms. Ford's sentence, the more life will pass her by, she will become institutionalized, and her transition back to society will be more difficult. *See United States v. Hawkins,* 380 F.Supp.2d 143, 165 (E.D.N.Y. 2005), *aff'd,* 228 Fed.Appx. 107 (2d Cir. 2007) (concluding that incarceration "will in effect doom her.... Rehabilitation should not now be destroyed by wanton and unthinking application of mechanical rules for imprisonment.").

Ms. Ford is submitting separately a report of a forensic psychological exam that will hopefully uncover some of the issues that have plagued her and led her to this place in her life. She asks that the Court consider this in determining an appropriate sentence. As the Supreme Court recently reiterated, "the punishment should fit the offender and not merely the crime." *Pepper*, 131 S.Ct. at 1240 (citations omitted).

Ms. Ford was also the sole support for her children. The children's fathers provide little financial or other support. Due to Ms. Ford's detention pending the outcome of this case, Ms. Ford's mother has been caring for the children. Ms. Ford's mother had to leave her job in order to be home for the children as four are minors and three are twelve or under, including a two year old. Ms. Ford's mother was not expecting to raise four minor children at her age, and it will be difficult for her physically and financially. If Ms. Ford's mother is unable to continue caring for the children, they will be placed in foster care. Once in foster care, they could be seperated and

lose touch with their mother and siblings.  Ms. Ford's family prays the Court show leniency so that they do not have to bear the consequences of her punishment.

A sentence of five years is sufficient and not greater than necessary to accomplish the goals of sentencing.  Ms. Ford will be adequately punished, and she can return to help raise her children. It will be five years she will miss watching her children grow up and being part of their lives.  Five years to her is an eternity.  For the reasons stated above, Ms. Ford prays the Court show leniency on her and sentence her to five years of incarceration.

Respectfully submitted,

By: /s/ *P. Matthew Luka*_____
P. MATTHEW LUKA
Florida Bar No.  0555630
TROMBLEY & HANES. P.A.
707 North Franklin Street
10th Floor
Tampa, Florida  33602
Telephone: (813) 229-7918
Facsimile:  (813) 223-5204
mluka@trombleyhaneslaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *P. Matthew Luka*_____
P. MATTHEW LUKA